## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CARLOS RAMOS,**

        **Plaintiff**,

v.

**BUSHNELL HOLDINGS, LLC**,

        **Defendant**.

**Case No. 25-2045-DDC**

## <u>MEMORANDUM AND ORDER</u>

This is a case about getting passed over—and the reasons for it. Plaintiff Carlos Ramos has applied for four promotions during his employment tenure with defendant, Bushnell Holdings, LLC. Bushnell passed over him for all but one promotion. According to Ramos, his one-for-four record stems from Bushnell's unlawful discrimination based on his race, age, and national origin and Bushnell's retaliation for Ramos's complaints about the same. If it weren't for Bushnell's discrimination and retaliation, Ramos asserts, he'd be batting a thousand. Bushnell disagrees. It identifies a distinct legitimate, nondiscriminatory reason why it passed over Ramos for each of the three at-issue promotions. And it argues that Ramos fails to establish that these reasons are pretextual. Bushnell also asserts that Ramos's retaliation claims never get off the ground because Ramos never engaged in a qualifying protected activity.

Bushnell presents these arguments in its Partial Motion for Summary Judgment (Doc. 54) and related briefing, challenging all but one of Ramos's claims. The court grants Bushnell's partial motion, for reasons it explains, below. Only Ramos's unchallenged claim survives. The court begins by reciting the summary judgment facts, followed by the governing legal standard.

## I.      Background

Below, the court identifies the facts that control Bushnell's partial summary judgment motion.  They consist of undisputed facts and, sometimes, disputed facts, that are expressed in the light most favorable to Ramos—the party opposing the motion.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### *Ramos's Job*

Bushnell manufactures outdoor products, including scopes, binoculars, and hunting accessories.  Doc. 53 at 2 (PTO Stip. ¶ 2.a.i.).  On December 21, 2020, Bushnell hired Ramos to work in its Olathe, Kansas, facility.  *Id.* (PTO Stip. ¶ 2.a.ii.).  Ramos held the title of Material Handler I which included duties like picking and packing various products for shipment.  *Id.* (PTO Stip. ¶ 2.a.iii.).  Over the next three years, Ramos applied for four promotions—one for a Trainer (Material Handler III) position and three for a Team Lead position.  *Id.* (PTO Stip. ¶¶ 2.a.iv.–vi., ix.); Doc. 55-2 at 9 (Ramos Dep. 16:13–22).  Bushnell promoted Ramos to Trainer in October 2021.  Doc. 53 at 2 (PTO Stip. ¶ 2.a.v.).  But Ramos's three applications for a Team Lead position—in March 2021, November 2022, and October 2023—all proved unsuccessful. *Id.* (PTO Stip. ¶¶ 2.a.viii., x.); *see* Doc. 59-1 at 4 (Ramos Dep. Vol. II 12:12–13:19).  After his third fruitless Team Lead application, Ramos filed a Charge of Discrimination with the EEOC on December 5, 2023.  Doc. 53 at 3 (PTO Stip. ¶¶ 2.a.xi.–xii.).

### *March 2021 Team Lead Position*

Ramos applied for his first promotional opportunity—a Team Lead position—after he'd worked at Bushnell for three months.  *Id.* at 2 (PTO Stip. ¶ 2.a.iv.); Doc. 55-2 at 9 (Ramos Dep. 16:5–7, 13–22).  Two weeks after he applied, Ramos approached Distribution Operations Manager Angel Love to inquire about his application.  Doc. 59-1 at 4 (Ramos Dep. Vol. II 12:12–13:1).  Love, as the manager, was the primary decision maker in Team Lead position

applications.  Doc. 59-4 at 35–36 (Brown Dep. 35:22–36:20).  But the Team Lead decision was nonetheless "collective"—involving supervisors, managers, and the director.  *Id.* at 37 (Brown Dep. 37:5–8, 16–19).  In his deposition testimony, Ramos recounts his post-application exchange with Manager Love as follows:

> "I applied for this position, but I have not heard anything about it, so I'm kind of wondering what's going on."
> And she said, "Well, you've got to wait for your turn."
> And I said, "Oh yes, of course, I know I've got to wait my turn."
> But she said, "There's a lot of people in front of you."
> I said, "That's fine."

Doc. 59-1 at 4 (Ramos Dep. Vol. II 12:21–13:7).

A week or two after this exchange, Love announced the people selected for the March 2021 Team Lead positions.  *Id.* (Ramos Dep. Vol. II 13:9–12).  According to Ramos's recollection, Bushnell appointed two or three new Team Leads.  Doc. 55-3 at 14–15 (Ramos Dep. Vol. II 40:19–41:5).  Two of those leads were African American persons.  *Id.* at 13 (Ramos Dep. Vol. II 37:4–8).  Ramos couldn't remember whether a third position existed, or who filled it.  *Id.* at 14–15 (Ramos Dep. Vol. II 40:19–41:5).  Ramos also testified that he doesn't know whether other Hispanic employees, besides himself, applied for the positions.  *Id.* at 14 (Ramos Dep. Vol. II 40:15–18).  But, as far as he remembers, only African American persons received promotions during Love's tenure—not people like himself, "from Mexican origin[.]"  Doc. 59-1 at 4 (Ramos Dep. Vol. II 11:2–9).

Ramos also testified that Manager Love never said anything about his national origin that he perceived as negative.  Doc. 55-3 at 4 (Ramos Dep. Vol. II 9:12–15).  But he nonetheless believes Love discriminated against him based on national origin nonetheless because during her tenure those hired were "almost only African-American"—a trend that shifted when Love left the company.  *Id.* at 6 (Ramos Dep. Vol. II 11:16–23).  Another employee—Third Shift

Supervisor Bruce Diebold—also testified that Love favored African American persons, a conclusion he reached because Love excluded Diebold from meetings.  Doc. 59-2 at 9 (Diebold Dep. 26:1–25).

Immediately after the meeting where Love announced the new March 2021 Team Leads, Ramos spoke with LaToya Brown, the Human Resources Manager.  Doc. 59-1 at 4 (Ramos Dep. Vol. II 13:14–19).  Ramos wanted to know why Love hadn't interviewed him for the position. *Id.*  Brown had helped Ramos apply.  Doc. 55-2 at 8–9 (Ramos Dep. 15:22–23, 16:5–9).  Ramos explained his grievance to Brown like this:  "I was told it was equal opportunity for everybody . . . You post that position just to kind of cover yourselves, that you are following the law, but you are not. . . . They didn't even interview me[.]"  Doc. 59-1 at 4–5 (Ramos Dep. Vol. II 13:23–14:3).

Brown testified about that conversation, explaining that Ramos asked her why he never got an interview.  Doc. 59-4 at 87 (Brown Dep. 87:10–23).  She didn't recall the conversation involving "anything beyond . . .  just wondering why he was not receiving an interview."  *Id.* Indeed, Ramos acknowledged that he "just told LaToya [Brown] that they did not follow the proper steps because they basically did not interview" him.  Doc. 55-2 at 12–13 (Ramos Dep. 25:21–26:3).  While he "was aware that everybody who was selected was African American[,]" he "d[id]n't recall mentioning that to [Brown.]"  *Id.* at 13 (Ramos Dep. 26:3–6).  In short, Ramos "never reported" that he felt "discriminated against because of [his] race, age or national origin" to Brown.  *Id.* at 12–13 (Ramos Dep. 25:21–26:1).

After the conversation with Ramos, Brown asked Love why Ramos didn't receive an interview.  Doc. 59-4 at 87 (Brown Dep. 87:10–23).  Brown testified that it was because Love "doesn't like" Ramos, a response Brown then reported to Love's superiors.  *Id.* at 87–88 (Brown

4

Dep 87:18–88:5).[1] Brown also testified that, early on in Ramos's time at Bushnell, Ramos applied for a promotion. *Id.* at 85 (Brown Dep. 85:6–22). Brown couldn't nail down which position Ramos had applied for early on—Supervisor or Team Lead. *Id.* But—Brown testified—whatever position it was, Bushnell cited Ramos's then-brief tenure at the company as the reason he didn't get the promotion. *Id.*

Sometime later Ramos reported to HR Specialist Darnetha Elmore that—after his March 2021 application and conversation with HR Manager Brown—he was "being ignored." Doc. 55-2 at 14, 15 (Ramos Dep. 30:22–23, 31:4–5). And he said that Love had told him he needed her permission before going to HR. Doc. 59 at 32–33 (Ramos Dep. 32:24–33:15).

---

[1]     A subsequent portion of Brown's testimony about the no-interview conversation is the subject of a Motion for Leave to File Sur-Reply. Doc. 61 at 2. Brown testified that—after her report to Love's superiors—Ramos received an interview. Doc. 59-4 at 88 (Brown Dep. 88:3–11). Ramos contends that Bushnell first introduced this later-acquired interview fact in its Reply as a new argument. Doc. 61 at 2. And Ramos wants the opportunity to respond to it in a surreply. *Id.* at 3. Bushnell opposes Ramos's surreply request. Doc. 62. It argues that it didn't submit new material. *Id.* at 2. Instead, Ramos misstates Bushnell's position about the later-acquired interview, Bushnell contends. *Id.* And Bushnell asserts that Ramos's surreply itself introduces a new argument about inferring prejudice from Love's dislike. *Id.* at 3.

These filings ably demonstrate why our court—and other courts—disfavor surreplies. *Beat Est. of Dyche v. United States*, No. 08-1267-JTM, 2008 WL 11383390, at *2 (D. Kan. Dec. 15, 2008) ("[L]ate attempts to reargue matters are precisely why surreplies enjoy the heavy disfavor of the Court, and why the Court permits such pleadings only in the most exceptional of cases."). One party points the finger at the other party's allegedly new arguments. And, in response, the other party points the finger right back. A never-ending string of surreply filings ensues.

"Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply." *Hampton v. Barclays Bank Del.*, 478 F. Supp. 3d 1113, 1142 (D. Kan. 2020) (citing D. Kan. Rule 7.1(a), (c)), *aff'd*, No. 20-3175, 2021 WL 3237082 (10th Cir. July 30, 2021). "'Surreplies are typically not allowed.'" *Id.* (quoting *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd*, 189 F. App'x 752 (10th Cir. 2006)). "When an argument is raised for the first time in reply, a district court may either grant leave to file a surreply or may disregard the newly raised materials and arguments." *C&M Res., LLC v. Extraction Oil & Gas, Inc.*, 159 F.4th 755, 762 (10th Cir. 2025). Here, to the extent one can construe Bushnell's Reply as raising new material asserting Ramos received an interview during the March 2021 application process, the court disregards it. Nor will the court consider any new argument raised in Ramos's proposed surreply. The court thus denies Ramos's Motion for Leave to File Sur-Reply (Doc. 61), exercising its discretion instead to disregard these newly raised materials and arguments.

*October 2021 Trainer Position*

Several months later, Love informed Ramos that a Trainer (Material Handler III) position was available. *Id.* at 4–5 (Ramos Dep. 9:23–10:2). Trainers utilize equipment—such as forklifts—and train Material Handlers. *Id.* at 6–7 (Ramos Dep. 12:16–13:10). In October 2021, Ramos applied for the Trainer promotion, again with Brown's help. Doc. 53 at 2 (Pretrial Order ¶ 2.a.v.); Doc. 55-2 at 5 (Ramos Dep. 10:3–11). Love interviewed Ramos for the position. Doc. 55-2 at 5 (Ramos Dep. 10:1–17). Ramos testified that he and Love had the following conversation at that interview:

> She said, "You want to be a lead?"
> I said, "Of course, I'm trying to"—
> She said, "But you are too old. You're getting ready to retire. Why should I retire you and then when you retire I have to hire somebody else?"

*Id.* at 24 (Ramos Dep. 45:8–12). Ramos couldn't recall reporting Love's alleged comment about his age to a Supervisor. *Id.* (Ramos Dep. 45:21–22). And he never reported it to HR. *Id.* (Ramos Dep. 45:23–24).

Ramos received the Trainer promotion. Doc. 53 at 2 (PTO Stip. ¶ 2.a.v.). And he has remained in the Trainer role since October 2021. Doc. 55-2 at 6 (Ramos Dep. 12:16–18).

*November 2022 Team Lead Position*

In November 2022, Ramos again applied for a Team Lead position. Doc. 53 at 2 (PTO Stip. ¶ 2.a.vi.). And HR Manager Brown again helped Ramos complete the application process. Doc. 55-2 at 13 (Ramos Dep. 26:14, 21–22). Third Shift Supervisor Casey Ruff interviewed Ramos and others for the position. Doc. 55-5 at 4–5 (Ruff Dep. 12:2–13:8). Ruff never said anything negative to Ramos in connection with Ramos's national origin. Doc. 55-3 at 5 (Ramos Dep. Vol. II 10:16–20). Ruff recommended second interviews for his "top two" candidates— Janette Gonzaga Lara and Ramos—as well as one other candidate. Doc. 55-5 at 6–7 (Ruff Dep.

6

14:22–15:5).  But then, Bushnell temporarily cancelled the requisition and took down the job posting without promoting anyone.  Doc. 53 at 2 (PTO Stip. ¶ 2.a.vii.); Doc. 55-5 at 5, 7 (Ruff Dep. 13:21–25, 15:6–24).  No one ever explained to Ramos why Bushnell cancelled the opening.  Doc. 55-2 at 18–19 (Ramos Dep. 35:23–36:2).  But Ramos believed it was because of his race, age, or national origin.  *Id.* at 19 (Ramos Dep. 36:11–21).

Bushnell reopened the November 2022 position in April 2023.  Doc. 53 at 2 (PTO Stip. ¶ 2.a.vii.).  And it selected Janette Gonzaga Lara—a person of Mexican origin—to fill the position on May 4, 2024.  *Id.* (PTO Stip. ¶ 2.a.viii.); Doc. 55-5 at 5 (Ruff Dep. 13:14–15); Doc. 59-8 at 1 (Gonzaga Lara Offer Letter).  Ramos conceded in his deposition that Gonzaga Lara is from Mexico.  Doc. 55-2 at 26 (Ramos Dep. 79:19–25).

Ramos testified that he didn't apply for the position awarded to Gonzaga Lara.  Doc. 59-1 at 6, 10 (Ramos Dep. Vol. II 20:2–7, 34:23–35:2).  But Ruff testified that he considered the information and notes from the November 2022 interviews—not interviewing anyone again— and recommended Gonzaga Lara for the reopened position.  Doc. 55-5 at 6–7, 8–9 (Ruff Dep. 14:22–15:5, 40:11–41:15).  Ruff found Gonzaga Lara brought "a different perspective to the leadership group, and she st[ood] out above the rest in performance and standards."  *Id.* at 9 (Ruff Dep. 41:2–5).

### *October 2023 Team Lead Position*

Finally, in October 2023, Ramos applied one last time for a Team Lead promotion.  Doc. 53 at 2, 3 (PTO Stip. ¶¶ 2.a.ix., xi.).  As with the three earlier applications, HR Manager Brown helped Ramos apply.  Doc. 55-2 at 20 (Ramos Dep. 37:3–4, 10–12).  Third Shift Supervisor Bruce Diebold interviewed Ramos and another Hispanic employee—Johnathan Medrano—for the position.  Doc. 55-3 at 9–10 (Ramos Dep. Vol. II 22:18–23:9); Doc. 55-6 at 5 (Diebold Dep. 32:8, 14–15).  Diebold never said anything negative to Ramos about Ramos's national origin.

Doc. 55-3 at 5 (Ramos Dep. Vol. II 10:16–20).  After the interviews, Diebold communicated his recommendation by email.  Doc. 55-7 at 2 (Def. Ex. E-1).  He identified the decision between Ramos and Medrano as "a toss up" and noted that he was "good with whatever decision the group makes."  *Id.*

Within 10–20 minutes after Diebold completed the interview and sent his recommendation email, he witnessed Ramos "[i]nstead of doing his job . . . perched up on a table talking to some lady."  Doc. 55-6 at 6–7 (Diebold Dep. 35:6–36:3).  Diebold testified that Ramos wasn't on a break or taking lunch but was chatting during "work hours."  *Id.* at 7 (Diebold Dep. 36:2–6).  Diebold acknowledged that everybody would stop and talk for five or 10 minutes sometimes—making Ramos's behavior not that unusual.  *Id.* at 7–8 (Diebold Dep. 36:17–37:9).  Nonetheless, the timing bothered Diebold.  *Id.*  He found Ramos's behavior "at that time, after he interviewed for the lead job" troubling because "that's not the role model [Diebold] want[ed] to have" as a Team Lead.  *Id.* at 8 (Diebold Dep. 37:7–9).  Diebold testified that leads are "too busy to be able to sit there and talk for five or ten minutes."  *Id.* (Diebold Dep. 37:13–19).

Diebold never addressed this concern with Ramos, however, nor did Diebold write Ramos up for his behavior.  *Id.* at 7 (Diebold Dep. 36:7–13); Doc. 59-2 at 16 (Diebold Dep. 54:2–4).  And the employee who eventually secured this Team Lead position, Isabel Benitez Miguel, testified about downtime on the floor of the plant.  She explained that there are occasions where employees are waiting for a replenishment drop off and, so, will stand around chatting.  Doc. 59-5 at 12 (Benitez Miguel Dep. 37:5–38:12).  Indeed, she herself has had a conversation with someone on the plant floor that's unrelated to work a "couple of times."  *Id.* (Benitez Miguel Dep. 38:19–39:1).  Benitez Miguel also testified that having a side conversation

on the floor with someone is not the type of behavior that would disqualify a person as a Team

Lead. *Id.* (Benitez Miguel Dep. 39:2–6).

On making the decision between Medrano and Ramos, Diebold also testified that he got

the feeling that Love wanted Medrano to get the lead job—though Love never said so outright.

Doc. 59-2 at 21 (Diebold Dep. 73:20–74:3). Love never told Diebold she wanted him to hire

Medrano instead of Ramos. *Id.* (Diebold Dep. 73:20–22). But Diebold "felt kind of pressured"

even though Love "didn't say anything directly about it[.]" *Id.* (Diebold Dep. 74:5–10).[2]

Eventually, Bushnell offered the Team Lead position to Medrano, not Ramos. Doc. 55-3

at 9–10 (Ramos Dep. Vol. II 22:18–23:2). But Medrano declined. *Id.*; Doc. 55-6 at 9 (Diebold

Dep. 40:13–15).[3] Then, Diebold interviewed another Hispanic applicant, Benitez Miguel. Doc.

55-6 at 9 (Diebold Dep. 40:17–21); Doc. 59-5 at 8 (Benitez Miguel Dep. 20:11–12). Bushnell

hired Benitez Miguel for the Team Lead position. Doc. 53 at 3 (Pretrial Order ¶ 2.a.x.). Benitez

Miguel was born in California. Doc. 59-5 at 8 (Benitez Miguel Dep. 20:7–9). She had no

previous lead experience. *Id.* at 6–7 (Benitez Miguel Dep. 15:13–16, 15:25–16:2).

### *Ramos's Other HR Complaint*

---

[2]    The record is unclear about when Bushnell terminated Love's employment. Ramos's Response
contends it happened in October 2023. Doc. 58 at 15 (citing Doc. 59-3 at 11 (Love Dep. 34:1)). But the
cite to the record that accompanies that contention repeatedly identifies Love's employment terminating
in October 2022. Doc. 59-3 at 11 (Love Dep. 33:18–34:1). The court scoured the deposition and
discovered that the questioning attorney later showed Love an email from October 2023. *Id.* at 16 (Love
Dep. 53:1–15). Love then confirmed that the email demonstrates that Bushnell employed her past 2022.
*Id.* (Love Dep. 53:25–54:2). From this later deposition testimony, the court infers that Love remained
employed by Bushnell until at least October 2023.

[3]    Ramos's Response references an email from Brown about moving forward with Ramos since
Medrano had declined. Doc. 58 at 8. But Ramos provides no cite for this email. *Id.* And the court's
independent search didn't unearth a post-Medrano-refusal email in the record. "The purpose of a
summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence
to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue
of fact." *In re Grandote Country Club Co.*, 252 F.3d 1146, 1149 (10th Cir. 2001). The court thus
disregards Ramos's contention about Brown's email because it is unsupported by the record.

Ramos also lodged a complaint with HR about his request to change shifts. Doc. 55-2 at 14–18 (Ramos Dep. 30:18–35:2). Ramos told Love that he'd like to change shifts, and Love responded that it wasn't possible for him to do so. *Id.* at 15 (Ramos Dep. 31:6–24). Ramos complained to HR. *Id.* at 15–16 (Ramos Dep. 31:25–32:20). Ramos testified that he thought Love's denial of his request to change shifts was retaliatory. *Id.* at 18 (Ramos Dep. 35:5–7). But Ramos never mentioned retaliation, discrimination, race, age, or national origin in his conversation with HR. *Id.* at 17–18 (Ramos Dep. 34:23–35:13).

### *Ramos's Claims*

Ramos asserts six claims against Bushnell. Doc. 53 at 7 (PTO ¶ 4.a.).[4] He premises all six claims on a failure-to-promote theory. Under Title VII, Ramos asserts race and national origin discrimination (Count II) and retaliation (Count III) claims. *Id.* (PTO ¶¶ 4.a.i., ii.). Under 42 U.S.C. § 1981, Ramos asserts race and national origin discrimination (Count V) and retaliation (Count VI) claims. *Id.* at 8 (PTO ¶¶ 4.a.iii., iv.). And under the Age Discrimination in Employment Act (ADEA), Ramos asserts age discrimination (Count VII) and retaliation (Count VIII) claims. *Id.* (PTO ¶¶ 4.a.v., vi.). Ramos also asserts that his race and national origin discrimination claims intersect with his age discrimination claim—and vice-versa. *Id.* at 7–8 (PTO ¶¶ 4.a.i., iii., v.).

Bushnell seeks summary judgment against all claims except one: Ramos's ADEA discrimination claim premised on the November 2022 and October 2023 promotions. *See* Doc. 54 at 1 & n.1. But Bushnell's motion does reach one aspect of Ramos's ADEA discrimination

---

[4]    The Pretrial Order clarifies that Ramos has abandoned two of his claims: Count I (race discrimination in violation of Title VII) and Count IV (race discrimination in violation of 42 U.S.C. § 1981). Doc. 53 at 7 (PTO ¶ 4.a.).

claim—it challenges the ADEA discrimination claim premised on the March 2021 promotion as time-barred. Doc. 55 at 13–14.

Below, the court recites the legal standard governing this summary judgment motion. Then, it addresses Bushnell's summary judgment arguments.

## II.        Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving

party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, since 1986, federal courts haven't viewed summary judgment as a "disfavored procedural shortcut[.]" *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

The court begins its analysis by addressing those claims that don't make it to the starting line—either because they are time-barred or because the law doesn't recognize them. Then, the court addresses the other claims challenged at summary judgment: *first*, Ramos's race- and national-origin-based discrimination claims and, *second*, Ramos's retaliation claims. In the end,

only Ramos's unchallenged claim—his ADEA claim premised on the November 2022 and October 2023 promotions—survives for trial.

### III.    Time-Barred Claims

Bushnell asserts that Ramos's Title VII and ADEA claims based on the March 2021 promotion opportunity are time-barred.  Doc. 55 at 13.  In response, Ramos explicitly concedes that the ADEA claim based on the March 2021 position is time-barred.  Doc. 58 at 17.  He never addresses Bushnell's Title VII timeliness argument.  *See generally id.*

Title VII and ADEA plaintiffs must exhaust their administrative remedies by timely filing a charge of discrimination with the EEOC before filing a Title VII or ADEA claim in court.  *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018) ("A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter." (quotation cleaned up)); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1176 (10th Cir. 2011) (explaining that the ADEA "provides that 'no civil action may be commenced' in federal court unless the would be plaintiff first files a grievance with the appropriate administrative agency" (quoting 29 U.S.C. § 626(d)(1)(B))).  Title VII and the ADEA require the employee to file a charge of discrimination within 300 days of the alleged unlawful discrimination.  42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1)(B) (ADEA); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (explaining that a "discrete retaliatory or discriminatory act occurred on the day that it happened" and a plaintiff "therefore, must file a charge within . . . 300 days of the date of the act or lose the ability to recover for it" (internal quotation marks omitted)).  "A cause of action accrues under the . . . ADEA on the date the employee is notified of an adverse employment decision by the employer."  *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003) (quotation cleaned up).  The same holds true for Title VII.  *Lister v. City of Wichita*, 666 F.

App'x 709, 712 (10th Cir. 2016) ("The timeframe begins when the Title VII claim accrues, typically 'on the date the employee is notified of an adverse employment decision by the employer.'" (quoting *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 (10th Cir. 2007))).

Here, the summary judgment evidence demonstrates that Ramos learned he was not chosen for the March 2021 position three to four weeks after he had applied.  Doc. 59-1 at 4 (Ramos Dep. Vol. II 12:12–13:12) (explaining the three-to-four week timeline of Ramos's conversation with Love about the March 2021 position and her subsequent announcement about the position).  So, Bushnell had notified Ramos of its failure to promote him no later than April 2021.  Plaintiff filed his EEOC charge on December 5, 2023—more than two years later.  That's beyond the requisite 300 days.  Doc. 53 at 3 (PTO Stip. ¶ 2.a.xii.).  The court thus grants summary judgment in Bushnell's favor against Ramos's Title VII and ADEA discrimination claims premised on the March 2021 promotion opportunity.  They are time-barred.

## IV.        Unrecognized Claim

Bushnell next argues that Ramos's purported § 1981 national origin discrimination claim must fail.  Doc. 55 at 14.  It contends that § 1981 "'does not outlaw national origin discrimination per se, only discrimination on the basis of race.'"  *Id.* (quoting *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n.7 (10th Cir. 1991)).  Ramos's Response never disputes this conclusion.  *See generally* Doc. 58.  Ramos is silent for good reason.  Bushnell is right.

Section 1981 doesn't permit suit based on national origin discrimination.  *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, *rather than solely on the place or nation of his origin*, or his religion, he will have made out a case under § 1981." (emphasis added)); *see also Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs.*,

14

No. CIV 02-1509 JB/RLP, 2006 WL 4079033, at *1 (D.N.M. June 9, 2006) ("42 U.S.C. § 1981 does not redress national origin[.]").  The court thus grants Bushnell's bid for summary judgment on the portion of Ramos's § 1981 claim he premises on national origin discrimination.

Having narrowed the claims to those permitted under the statutory schemes, the court turns next to Ramos's still-breathing race and national origin discrimination claims under Title VII and § 1981.

## V.        Race and National Origin Discrimination Claims

Title VII and § 1981 have significant overlap.  "Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Section 1981 also prohibits an employer from discriminating against an employee on the basis of race.  *See* 42 U.S.C. § 1981(a), (b).  The "standards and burdens under § 1981 are the same as those under Title VII[.]"  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997).

A plaintiff may use direct evidence, indirect evidence, or both to support Title VII and § 1981 claims.  *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).  At the summary-judgment stage, the court analyzes indirectly supported claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Khalik*, 671 F.3d at 1192.  Under this *McDonnell Douglas* framework, a plaintiff, *first*, must establish a prima facie case.  *Bekkem*, 915 F.3d at 1267.  The "burden on the employee to establish a prima facie case is light[.]"  *Guy v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021).  *Second*, if plaintiff satisfies the obligations for a prima facie case, then the burden shifts to defendant, who must produce "'a legitimate nondiscriminatory reason for its employment

15

decision.'" *Bekkem*, 915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). As is the employee's burden at the first step, the employer's burden at this second stage is "exceedingly light." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (quotation cleaned up). *Last*, if defendant succeeds at the second step, the burden shifts back to the plaintiff, who then must "show that there is a genuine dispute of material fact" whether "the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief." *Bekkem*, 915 F.3d at 1267 (quotation cleaned up). In many Title VII and § 1981 claims, this is where the real action is.

To make a prima facie case of employment discrimination a plaintiff must show "that (1) [he] belongs to a protected class; (2) [he] applied for an available position for which [he] was qualified; (3) [he] was rejected under circumstances which give rise to an inference of unlawful discrimination." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (quotation cleaned up). The court assumes without deciding that Ramos has met his prima-facie burden and thus moves directly to step two—Bushnell's reasons for not promoting Ramos. It takes up each of the three promotions in turn. [5]

---

[5]    The court pauses to explain how its assumption that Ramos has met his prima facie burden affects the arguments this Order addresses.

Ramos's Response argument begins with a general discussion about intersectional discrimination. Doc. 58 at 16 (citing *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1049 (10th Cir. 2020)). *Frappied* recognized that sex-plus-age claims are cognizable under Title VII. 966 F.3d at 1048. And it borrowed the Equal Employment Opportunity Commission's definition of intersectional discrimination: it "prohibit[s] discrimination against an individual based on his/her membership in two or more protected classes . . . Intersectional discrimination can involve . . . , e.g., discrimination based on age and disability, or based on sex and age." *Id.* (first ellipsis in original) (quotation cleaned up). How precisely Ramos contends that this intersectional discrimination interacts with Bushnell's summary judgment arguments here isn't altogether clear. Does intersectional discrimination touch all or just one aspect of Ramos's *McDonnell Douglas* burden? Endeavoring to solve this puzzle, the court pieces together the following: It appears that Ramos invokes intersectional discrimination to support his prima facie discrimination case. Doc. 58 at 17. He seems to suggest that his prima facie case doesn't falter just because other Hispanic persons received the promotions that Ramos didn't receive. *See id.* Here's how the court puts the puzzle pieces together.

## A.    Legitimate, Non-Discriminatory Reason for Failing to Promote Plaintiff

At step two of the *McDonnell Douglas* framework, a defendant must articulate a

legitimate, nondiscriminatory reason for failing to promote plaintiff to the three positions.[6]

---

*First*, Ramos identifies the final element of a prima facie failure-to-promote discrimination claim as one requiring that "the position was filled by someone outside the protected class."  Doc. 58 at 17 (citing *Clay v. UPS*, 983 F. Supp. 2d 1331, 1341 (D. Kan. 2013)).  *Then*, Ramos argues, "the other selected candidates were both under the age of 40, while Plaintiff was 58 years of age."  *Id.  Later*, Ramos asserts that "Ms. Love never filled a position with any candidate who was Hispanic and/or over the age of 40.  The two Hispanic candidates were eventually selected . . . [but] both were under 40 years of age."  *Id.* at 18 (emphasis omitted).  Lining up these pieces, Ramos appears to invoke intersectional discrimination to argue that the court should define "the protected class" here to include both race and age—not just race.  By so defining the protected class, Ramos apparently intends to overcome one of Bushnell's prima facie arguments.  Specifically, Bushnell argues that

> Plaintiff cannot establish element (iv) of his *prima facie* case of race discrimination as to the November 2022 and October 2023 positions because both were filled by individuals of Hispanic origin in Plaintiff's protected class.  Nor can Plaintiff establish a *prima facie* case of national origin discrimination as to the November 2022 position, which was filled by an individual from Mexico in Plaintiff's protected class.

Doc. 55 at 16.  In short, Ramos seems to argue that intersectional discrimination saves his prima facie case despite Hispanic or Mexican coworkers successfully securing the promotions he lost.

Because the court assumes Ramos has established his prima facie case of discrimination, it declines to engage with the parties' intersectional-discrimination briefing.  Similar reasoning explains why the court also refrains from picking sides in a debate defendant identifies.  *See* Doc. 55 at 15 n.3.  Namely, the court needn't opine whether the person who filled the at-issue position also may qualify as a member of the same protected class.  *Id.*  In short, the court employs here an oft-applied principle:  where the court needn't decide a question, it *mustn't* decide it.  *People for the Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3 990, 1008 (10th Cir. 2017) ("If it is not necessary to decide more, then it is necessary not to decide more." (quotation cleaned up)).

[6]    An astute reader might ask:  Why does the court persist in addressing all three promotions?  Didn't the court already find the claims premised on the March 2021 promotion time-barred?  An excellent question.  While Ramos's Title VII claim based on the March 2021 promotion is time-barred, that promotion remains a viable basis for Ramos's § 1981 claim.  Here's why.  Bushnell never argued that Ramos's § 1981 claim was untimely.  And the timeliness analysis for § 1981 differs from that for Title VII.  *See Spears v. Thermo Fisher Sci.*, No. 22-2454-DDC, 2026 WL 1492572, at *13–14 (D. Kan. May 28, 2026) (identifying that Title VII and § 1981 have different deadlines and explaining when the four-year statute of limitations under 28 U.S.C. § 1658 applies to a § 1981 claim and when the analogous two-year state statute of limitations applies).  Because Bushnell hasn't challenged the timeliness of Ramos's § 1981 claim, the court doesn't complete a § 1981 limitations analysis here.  *See Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("Th[e] court, however, will not craft a party's arguments for him.").  Instead, the court analyzes Ramos's § 1981 claim premised on the March 2021 promotion as a timely claim.

Defendant's burden at this stage is, as already stated, an exceedingly light one. *Montes*, 497 F.3d at 1173.

When it comes to the March 2021 position, defendant asserts that the decision to hire other candidates—not Ramos—turned on seniority. Doc. 55 at 18 n.5. Ramos applied for the position when he'd worked at Bushnell for about three months. Doc. 55-2 at 9 (Ramos Dep. 16:5–7, 13–22). Ramos testified that when he asked Manager Love about the status of his promotion application, she told him that he had "to wait for [his] turn" because there were "a lot of people in front of [him]." Doc. 59-1 at 4 (Ramos Dep. Vol. II 13:2–6). And HR Manager Brown testified that when Ramos applied for a promotion "very early on" in his tenure, Bushnell's reason for not finding Ramos eligible was because "he hadn't even been at the job that long[.]" Doc. 59-4 at 85 (Brown Dep. 85:6–22). So, Bushnell proffers length-of-tenure as its legitimate, nondiscriminatory reason for passing over Ramos in March 2021.

Ramos's second promotion application occurred in November 2022. The interviewer in that round—Supervisor Ruff—identified Ramos as one of his "top two" candidates and recommended him for a second interview. Doc. 55-5 at 6–7 (Ruff Dep. 14:22–15:5). After that decision, Bushnell temporarily closed the position, reopening it in April 2023. Doc. 53 at 2 (PTO Stip. ¶ 2.a.vii.). In May 2024, Bushnell selected another Hispanic candidate born in Mexico—Janette Gonzaga Lara—for the reopened position. *Id.* (PTO Stip. ¶ 2.a.viii.); Doc. 55-2 at 26 (Ramos Dep. 79:19–25); Doc. 55-5 at 5 (Ruff Dep. 13:14–15); Doc. 59-8 at 1 (Gonzaga Lara Offer Letter). Ruff testified that he recommended Gonzaga Lara because she brought "a different perspective to the leadership group, and she st[ood] out above the rest in performance and standards." Doc. 55-5 at 9 (Ruff Dep. 41:2–5). So, Bushnell proffers choice of a superior candidate as its legitimate, nondiscriminatory reason for passing over Ramos in November 2022.

18

Finally, Ramos applied for a Team Lead promotion in October 2023. Doc. 53 at 2 (PTO Stip. ¶ 2.a.ix.). The interviewer this time was Supervisor Diebold. Doc. 55-6 at 5 (Diebold Dep. 32:6–8). His immediate impression, after the interviews, was that it was "a toss up" between Ramos and Johnathan Medrano—another Hispanic employee. Doc. 55-7 at 2 (Def. Ex. E-1). But Diebold testified that he changed his opinion about Ramos when he witnessed him, minutes after their interview, engaged in a non-work related conversation while on the clock. Doc. 55-6 at 6–7 (Diebold Dep. 35:6–36:3). Diebold found that behavior "at that time, after he interviewed for the lead job" unusual. *Id.* at 8 (Diebold Dep. 37:6–8). Diebold thus surmised that Ramos was "not the role model [he]'d like to have[.]" *Id.* (Diebold Dep. 37:8–9). Diebold believed that Team Leads are "too busy to be able to sit there and talk for five or ten minutes." *Id.* (Diebold Dep. 37:13–19). So, Bushnell offered the job to Medrano, who turned it down. Doc. 55-3 at 9–10 (Ramos Dep. Vol. II 22:18–23:2). Bushnell then selected another Hispanic applicant, one who was born in California, Isabel Benitez Miguel. Doc. 53 at 3 (Pretrial Order ¶ 2.a.x.); Doc. 59-5 at 8 (Benitez Miguel Dep. 20:7–12). Bushnell thus proffers its final reason—Ramos's post-interview behavior created doubt about Ramos's readiness for a lead position.

Bushnell thus has discharged its burden to articulate legitimate, nondiscriminatory reasons for its three decisions not to promote plaintiff—length of tenure, a superior candidate, and Ramos's perceived inattentiveness to work immediately after his October 2023 interview. Given the "exceedingly light" burden for an employer at this stage of the *McDonnell Douglas* framework, *Montes*, 497 F.3d at 1173 (quotation cleaned up), these reasons pass muster. Now, the burden shifts to Ramos. His claims can't survive summary judgment unless he can demonstrate a triable issue that these reasons are pretextual.

**B.    Pretext**

19

To shoulder his burden at the third step of the *McDonnell Douglas* framework, Ramos must adduce sufficient evidence for a rational jury to conclude that his national origin or race was a determinative factor in Bushnell's refusal to promote him, or that the explanations Bushnell has articulated for those decisions are merely pretextual. *Tabor*, 703 F.3d at 1217. Ramos can shoulder this burden many different ways, but here are two common routes:

(1) by showing that the proffered reason is factually false or

(2) by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

*Id.* at 1218 (quotation cleaned up).

"'In determining whether the proffered reason for a decision was pretextual, [courts] examine the facts as they appear *to the person making the decision*,' and 'do not look to the plaintiff's subjective evaluation of the situation.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (emphasis in original) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011)). Courts don't ask "whether the employer's proffered reasons were wise, fair or correct" but only inquire "whether the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (quotation cleaned up). The court's "role is to prevent intentional discriminatory practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1308 (10th Cir. 2017) (quotation cleaned up). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Bekkem*, 915 F.3d at 1268 (quotation cleaned up). "The determinative question is whether a reasonable factfinder could rationally find the employer's

20

rationale unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Dewitt*, 845 F.3d at 1308 (quotation cleaned up).  When assessing pretext, the court "'must consider the evidence of pretext in its totality.'" *Payan v. United Parcel Serv.*, 792 F. App'x 634, 645 (10th Cir. 2019) (quoting *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018)).

Here, Ramos fails to assemble any evidence from which a reasonable factfinder could infer that Bushnell's asserted rationales are unworthy of credence.  Part of Ramos's problem is how little effort he puts into this important endeavor.  His entire pretext argument, after reciting the governing law, spans just 10 sentences.  Doc. 58 at 18–19.  And Ramos had plenty of room to expand—in total, his Response consumed just 20 of the 40 pages permitted.  *See* D. Kan. Rule 7.1(d)(2).  Apparently, Ramos hopes the court will ferret out the relevant facts and fill in the gaps.  It won't.  *See Adler*, 144 F.3d at 672 (explaining that courts "have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) ("Judges are not like pigs, hunting for truffles buried in briefs." (quotation cleaned up)).

Best the court can tell from his 10-sentence tribute to brevity, Ramos advances three pretext arguments:  (i) Love refused to interview Ramos for the first Team Lead position; (ii) Love refused to promote Hispanic and/or older employees; and (iii) Diebold's alleged change-of-heart about promoting Ramos, due to Ramos's post-interview chat session, doesn't add up.  Taking this purported evidence of pretext in its totality—as it must—the court concludes that Ramos has failed his *McDonnell Douglas* burden to show that Bushnell's reasons for not

21

promoting him were pretextual.  The court addresses each of his pretext arguments, in turn, below.

### 1.      Refusal to Interview

Ramos first contends that Love's failure to interview Ramos for the March 2021 position suggests pretext.  Doc. 58 at 19.  But Ramos never explains why that's so.  His two-sentence argument simply cites a Fifth Circuit case for the proposition that "an employer's failure to interview a candidate can 'help carry the burden of proving pretext.'"  *Id.* (quoting *Easley v. Lowndes County*, No. 21-60136, 2022 WL 39001, at *3 (5th Cir. Jan. 4, 2022)).  But *Easley* doesn't support that proposition categorically.  Instead, *Easley* goes on to acknowledge that, in some circumstances, just the opposite is true.  2022 WL 39001, at *3.  Indeed, the Fifth Circuit determined that a "failure to interview . . . does *not* give rise to an inference of pretext" where there's an "informal hiring context" and a candidate is already "well known" to the hiring party. *Id.* (emphasis added).  The facts here align more closely with *Easley*'s "informal hiring context[.]"  *Id.*  For example, Ramos was already "well known" to Love when he applied for the March 2021 promotion—he'd already worked at Bushnell for three months, after all.  Doc. 55-2 at 9 (Ramos Dep. 16:5–7, 13–22).  So, under *Easley*, Love's failure to interview Ramos doesn't give rise to an inference of pretext.  Plus, *Easley* clarified that "the failure to interview, *standing alone*, gives rise to no entitlement to recover."  2022 WL 39001, at *3 (emphasis added) (quotation cleaned up).  And Ramos's argument points just to Love's failure to interview—standing alone.

What's more, the court must "examine the facts as they appear" to Love—not Ramos's "subjective evaluation of the situation."  *DePaula*, 859 F.3d at 971 (quotation cleaned up).  From Love's perspective, she saw Ramos as the last in a long line of applicants, one who needed to "wait for [his] turn."  Doc. 59-1 at 4 (Ramos Dep. Vol. II 12:21–13:7).  Not interviewing the

candidate least likely to secure the position—given his short tenure—doesn't suggest pretext, but efficiency.  Such a decision doesn't reveal "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason[.]"  *Tabor*, 703 F.3d at 1218 (quotation cleaned up).  On the contrary, choosing to interview just those candidates at the front of the line is fully consistent with the employer's articulated promotion reason—seniority.  And Ramos's subjective evaluation that he was "ignored" when applying for the March 2021 position doesn't alter the court's conclusion.  Doc. 55-2 at 19 (Ramos Dep. 36:11–16).  Ramos's first pretext argument thus fails to persuade.  On to the second.

### 2.   Refusal to Promote Hispanic/Older Employees

Next, Ramos advances the following argument about Love's alleged refusal to promote: "Bushnell . . . gives a boilerplate reason for positions being 'canceled' and reopened.  Those reasons are not legitimate because the positions were only reopened after Ms. Love was terminated who refused to promote Hispanic and/or older employees."  Doc. 58 at 19.  Ramos provides no further explanation of this pretext argument.  At least two problems emerge from this cursory argument.

*First*, the only evidence in the summary judgment record to establish that Love refused to promote older or Hispanic employees is Ramos's own conjecture.  Ramos testified that, as far as he remembers, only African American employees received promotions during Love's tenure— not people "from Mexican origin[.]"  Doc. 59-1 at 4 (Ramos Dep. Vol. II 11:2–9).  So, he believes Love discriminated against him based on national origin because she allegedly hired "almost only African-American[,]" a pattern, he testified, that changed once she left.  *Id.* (Ramos Dep. Vol. II 11:16–23).  But Ramos never offers any facts to back up this surmise, just his own conjecture.  As Bushnell points out, the record is devoid of any evidence about the applicant pool for Team Lead openings when Love was the manager—that is, Ramos adduces no evidence

about the applicants' qualifications or about their race.  Doc. 60 at 9; *see also Smith v. Douglas Cable Commc'ns*, 881 F. Supp. 1510, 1515 (D. Kan. 1995) (rejecting argument that minority never having held supervisory position at defendant's company demonstrates pretext "because there is no indication of whether minorities ever applied for a supervisory position . . . and whether they were rejected in favor of equally or less-qualified persons of a different race").  Indeed, Ramos testified that he doesn't know whether other Hispanic employees applied for the positions at issue, or if it was just him.  Doc. 59-1 at 11 (Ramos Dep. Vol. II 40:15–18).  The court simply can't conclude from Ramos's mere conjecture—with no demographic information about the applicant pool—that Love preferred particular applicants based on race.  *See Bekkem*, 915 F.3d at 1268 ("Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." (quotation cleaned up)).

To be sure, Ramos also references Diebold's testimony that Love favored African American persons.  Doc. 59-2 at 9 (Diebold Dep. 26:1–25).  But Diebold grounded that alleged favoritism in Love excluding Diebold from meetings—not because Love hadn't promoted individuals of other races.  *See id.* (Diebold Dep. 26:16–19).  Diebold never testifies—or even implies—that Love's alleged preference for African American persons extended to promotion decisions.  So, the sum total of the evidence to support Ramos's only-African-Americans-get-promoted theory is his own surmise—with no applicant-pool evidence or other testimony to support it.  Where a plaintiff relies just on his own statements, "without any other supporting evidence[,]" it's "insufficient to create an issue of material fact."  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1223–24 (10th Cir. 2022).  Instead, a plaintiff instead must adduce "'sufficient objective evidence'" and not simply reference his "'own deposition transcript.'"  *Id.*

24

at 1224 (emphasis omitted) (quoting *Wheeler v. BNSF Ry. Co.*, 418 F. App'x 738, 751 (10th Cir. 2011)).

*Second*, Ramos's Response itself contradicts this refusal-to-promote assertion.  His Response contends that Love pressured Diebold to hire Medrano, not Ramos.  Doc. 58 at 8, 13 (citing Doc. 59-2 at 21 (Diebold Dep. 74:5)).  And Diebold testified that he felt that pressure, though he admits Love never explicitly directed him to hire Medrano.  Doc. 59-2 at 21 (Diebold Dep. 73:23–74:10).  The record shows that Medrano is Hispanic.  Doc. 55-3 at 10 (Ramos Dep. Vol. II 23:8–9).  If Love only sought to promote African American persons—as Ramos contends—why then would she throw her weight behind an Hispanic candidate like Medrano instead of pushing for another African American promotion?

Ramos can't answer these important questions that go to the heart of his pretext theory.  In sum, it's not sufficient to warrant a trial.

### 3.    Diebold's Change of Heart

For his final pretext argument, Ramos focuses on Diebold's alleged change-of-heart when recommending successful interviewees for the October 2023 position.  Doc. 58 at 18.  Indeed, Ramos puts most of his pretext eggs in this change-of-heart basket, tripling his other two-sentence pretext arguments and constructing a full-fledged paragraph here.  *Id.* at 18–19.  Recall that Diebold originally determined that the choice between Ramos and Medrano was "a toss up[.]"  Doc. 55-7 at 2 (Def. Ex. E-1).  But just minutes later, he witnessed Ramos engaging in casual, recreational conversation while on the clock—behavior that Diebold found inconsistent with the role model he hoped to promote.  Doc. 55-6 at 6–8 (Diebold Dep. 35:6–37:19).  So, Diebold changed his vote, first to Medrano and, eventually, to Benitez Miguel.

Ramos's Response lists—rapid-fire—the apparent shortcomings of Diebold's change-of-heart story.  Ramos notes that Diebold never addressed this behavior with Ramos head-on, never

recorded it, and never reported it to anyone else.  Doc. 58 at 18.  Then, Ramos highlights

Diebold's testimony that he felt pressured by Love to choose another candidate for this position.

*Id.*  And he emphasizes that Diebold didn't take notes during the interview process—though

Ramos provides no record cite to support that allegation.  *Id.*  Ramos also asserts that "multiple

employees said they wouldn't disqualify a candidate for similar behavior"—again, though,

without adequate support.  *Id.*  The record only establishes that one employee so testified—not

"multiple employees."  *Id.*; Doc. 59-5 at 12 (Benitez Miguel Dep. 39:2–6).  Ramos never

elaborates on the significance of the shortcomings he identifies and he never explains how,

exactly, they demonstrate a triable issue about pretext.

With no fulsome argument about Ramos's rapid-fire statements, the court is left to infer

what this collection of shortcomings might reveal.  Taken together, the statements appear to

suggest that Diebold deviated from unwritten company policy or practice:  Diebold never

addressed or documented Ramos's post-interview chat session, failed to take interview notes,

and disqualified Ramos on a basis that at least one other employee didn't find worthy of

disqualification.

A plaintiff may show pretext by demonstrating that "the defendant acted contrary to a

written company policy, an unwritten company policy, or a company practice when making the

adverse employment decision affecting the plaintiff."  *DePaula*, 859 F.3d at 970 (quotation

cleaned up).  "This showing requires evidence of not just any procedural shortfall, but of a

disturbing procedural irregularity."  *Payan*, 792 F. App'x at 646 (quotation cleaned up).  "'The

mere fact that an employer failed to follow its own internal procedures does not necessarily

suggest that the substantive reasons given by the employer for its employment decision were

pretextual.'"  *Id.* (quoting *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007)).

Instead, "the employee must present evidence that the employer believed that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *DePaula*, 859 F.3d at 976 n.25 (quotation cleaned up).

Here, Ramos first implies that Diebold should have addressed or documented Ramos's behavior after the interview. But the record doesn't support this assertion. To be sure, Bushnell's corporate representative testified that Ramos's post-interview conduct would require "coaching." Doc. 59-6 at 8 (Anderson Dep. 23:21–25). But she also clarified that coaching or other discipline only follows when the conduct "is repetitive conduct[.]" *Id.* (Anderson Dep. 21:17–22:1). Diebold's failure to address or document Ramos's behavior thus doesn't support an inference of pretext on a contrary-to-policy theory. Nor does Diebold's failure to take interview notes support such an inference. Indeed, Ramos makes no attempt to demonstrate that company policy or practice mandated note-taking during interviews. *See generally* Doc. 58. Instead, he just points out that Diebold didn't take interview notes and says nothing more. The mere failure to take notes during an interview—without more—doesn't reveal a disturbing procedural irregularity sufficient to support an inference of pretext. After all, a plaintiff has the burden to "present evidence that the employer believed that a relevant company policy existed[.]" *DePaula*, 859 F.3d at 976 n.25 (quotation cleaned up). Ramos offers no such evidence here. The same holds true for Benitez Miguel's testimony that Ramos's chat session wouldn't disqualify an employee from a promotion. Ramos never identifies any company policy—written or otherwise—that lists the criteria for a Team Lead. Without such criteria, one supervisor may deem extraneous chatter immediately after an interview as unprofessional, while another supervisor properly might reach a different conclusion. But that difference of opinion doesn't demonstrate pretext. In short, Ramos hasn't cleared the first hurdle to demonstrate

pretext based on these facts—*i.e.*, showing that a company policy or practice existed—to say nothing of establishing a choice to deviate from that policy. *See DePaula*, 859 F.3d at 976 n.25. Even when the court views the facts in the light most favorable to Ramos, this collection of shortcomings simply doesn't suffice to demonstrate pretext. A similar conclusion follows from Ramos's last pretext argument.

Ramos's Response concludes with one final swing at pretext. In it, Ramos argues that Diebold "selected a candidate with absolutely no leadership experience" and argues that pretext inheres where "the plaintiff's qualifications are 'clearly superior' to the selected candidates' qualifications." Doc. 58 at 19 (quoting *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1492 (9th Cir. 1995)). He thus implies—without expounding or citing the record—that Ramos's qualifications were "'clearly superior'" to Benitez Miguel's qualifications. *Id.* (quoting *Odina*, 53 F.3d at 1492).

Courts may infer pretext "where the facts assure [the court] that the plaintiff is better qualified than the other candidates for the position." *Santana v. City and County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (quotation cleaned up). But "pretext cannot be shown simply by identifying minor differences between plaintiff's qualifications and those of successful applicants[.]" *Id.* (quotation cleaned up). A plaintiff instead must demonstrate "an overwhelming merit disparity." *Id.* (quotation cleaned up). Indeed, "[d]ifferences in qualifications among candidates are generally not probative evidence of discrimination unless one candidate is so clearly better qualified that no reasonable employer would have made the same hiring decision." *Belt v. United Airlines, Inc.*, No. 12-cv-00059-RBJ-CBS, 2012 WL 6110705, at *4 (D. Colo. Dec. 10, 2012) (quotation cleaned up).

Ramos's pretext argument never demonstrates the requisite "overwhelming merit disparity." *Santana*, 488 F.3d at 865 (quotation cleaned up). In fact, Ramos's argument never identifies his qualifications—at all. *See* Doc. 58 at 18–19. Nor does it explain how the selected candidate—Benitez Miguel—was underqualified, by comparison. *See id.* That's a far cry from showing he was "clearly better qualified[.]" *Belt*, 2012 WL 6110705, at *4 (quotation cleaned up). Ramos doesn't even provide the court with raw data needed to assess the qualifications of one candidate vis-à-vis the other, let alone argue persuasively that Ramos's qualifications constituted more than "minor differences," *Santana*, 488 F.3d at 865 (quotation cleaned up), such that "no reasonable employer" would have promoted Benitez Miguel over Ramos, *Belt*, 2012 WL 6110705, at *4 (quotation cleaned up). Concisely, Ramos's briefing is woefully insufficient.

Our Circuit requires a plaintiff to "come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Laul v. Los Alamos Nat'l Lab'ys*, 765 F. App'x 434, 441 (10th Cir. 2019) (quotation cleaned up). Indeed, to "support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong." *Id.* (quotation cleaned up). Ramos has produced no evidence here capable of demonstrating an overwhelming merit disparity—not even a solitary cite to the record. *See* Doc. 58 at 18–19. He has done nothing to shore up his qualifications-based pretext argument, devoting just a single sentence and one parenthetical case citation to the effort. *See id.* Such inadequate briefing is fatal to Ramos's qualifications argument. *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might

require submission of the case to a jury." (quotation cleaned up)); *Kirkpatrick v. Colvin*, 663 F. App'x 646, 649 (10th Cir. 2016) (clarifying that it isn't the court's "obligation to search the record and construct a party's arguments"). "If the rule were otherwise, 'the workload of the district courts would be insurmountable[.]'" *Singleton v. Trulite Glass & Aluminum Sols., LLC*, No. 24-cv-320-JAR, 2025 WL 3732510, at *2 (E.D. Okla. Aug. 21, 2025) (quoting *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000)).

In sum, Ramos's pretext arguments—even when considered in their totality—don't shoulder his burden to adduce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Bushnell's proffered reasons for selecting other candidates over Ramos. *Tabor*, 703 F.3d at 1218 (quotation cleaned up). Just because a plaintiff says there was pretext doesn't make it so—he must produce evidence to support that pretext assertion. *Laul*, 765 F. App'x at 441 (requiring plaintiff to produce evidence to establish pretext). Ramos fails to provide the requisite summary judgment evidence to support his pretext arguments. No reasonable jury could infer that Bushnell's reasons are pretextual and "unworthy of credence" based on Ramos's pretext arguments. *Tabor*, 703 F.3d at 1218 (quotation cleaned up). His race- and national-origin-based discrimination claims thus fail to survive summary judgment at *McDonnell Douglas*'s step three.

Next, the court addresses the other claims challenged at summary judgment—Ramos's retaliation claims.

## VI.    Retaliation Claims

Ramos also brings retaliation claims under Title VII, § 1981, and the ADEA. Doc. 53 at 7–8 (PTO ¶¶ 4.a.ii., iv., vi.). He premises his retaliation claims on the same theory that supports his discrimination claims. Namely, Ramos asserts that Bushnell retaliated against him by failing to promote him after his complaint of discrimination. *Id.*

30

"A plaintiff bringing a retaliation claim must establish that retaliation played a part in the employment decision[.]" *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015) (quotation cleaned up) (Title VII retaliation).  As with the discrimination claims addressed earlier in this Order, a plaintiff may satisfy this burden in two ways.  He "may either (1) offer direct evidence that retaliation played a motivating part in an employment decision adverse to [his] interests, or (2) rely upon circumstantial evidence under the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation."  *Id.* (quotation cleaned up); *see also Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) (applying *McDonnell Douglas* framework to § 1981 and Title VII retaliation claims); *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008) (applying *McDonnell Douglas* framework to ADEA retaliation claim).

Here, Ramos doesn't offer direct evidence of retaliation, so the court evaluates his retaliation claims under the *McDonnell Douglas* burden-shifting framework.  *See Khalik*, 671 F.3d at 1192; *see also Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (noting that "[w]here, as here, the plaintiff does not have direct evidence of retaliation, we follow the three-step framework from *McDonnell Douglas*").  Under this burden-shifting framework, Ramos first must establish a prima facie case of retaliation.  *See Khalik*, 671 F.3d at 1192–93.  Stating a prima facie retaliation claim requires the plaintiff to show "'(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193).

31

Bushnell's papers challenge both the first and third elements of Ramos's prima facie retaliation claims. But the court needs only reach the first element. There, Bushnell argues that Ramos didn't engage in protected activity because his allegedly qualifying complaint never involved a reference to discrimination. Doc. 55 at 24–25. In his Response, Ramos anchors his protected activity to his spring 2021 conversation with Brown. Doc. 58 at 19. Recall that when Ramos didn't get an interview for the March 2021 Team Lead position, he spoke with HR Manager Brown. Ramos complained that he hadn't gotten an interview, stating that he "was told it was equal opportunity for everybody[.]" Doc. 59-1 at 4 (Ramos Dep. Vol. II 13:14–19, 23–24). He continued: "You post that position just to kind of cover yourselves, that you are following the law, but you are not. . . . They didn't even interview me." *Id.* at 4–5 (Ramos Dep. Vol. II 13:25–14:3). And Ramos also testified that, after he complained about Love not interviewing him, "everything was done for" him, Doc. 55-2 at 14 (Ramos Dep. 30:10–20), and that Love later told her employees to get permission before going to HR, Doc. 59 at 33 (Ramos Dep. 33:6–12).

Brown testified that the conversation with Ramos didn't involve "anything beyond . . . just wondering why he was not receiving an interview." Doc. 59-4 at 87 (Brown Dep. 87:10–23). Indeed, Ramos acknowledged that he "just told LaToya [Brown] that they did not follow the proper steps because they basically did not interview" him. Doc. 55-2 at 12–13 (Ramos Dep. 25:21–26:3). Ramos also testified that—while he "was aware that everybody who was selected was African American"—he doesn't "recall mentioning that to [Brown.]" *Id.* at 13 (Ramos Dep. 26:3–6). Importantly, Ramos testified that he "never reported" to Brown that he felt "discriminated against because of [his] race, age or national origin[.]" *Id.* at 12–13 (Ramos Dep. 25:21–26:1).

32

The question the court must answer here, then, is this: When talking to Brown, did Ramos's references to "equal opportunity for everyone" and to Bushnell not "following the law" qualify as protected activity capable of supporting his retaliation claims? In other words, if a plaintiff invokes equal opportunity and unlawful behavior in general—but never identifies a specific type of discrimination—does that complaint satisfy the first element of a prima facie retaliation case?

Tenth Circuit precedent says no. "The absence of a reference to unlawful discrimination can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Iweha v. Kansas*, 121 F.4th 1208, 1234 (10th Cir. 2024) (quotation cleaned up) (quoting with approval *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim.")).

*Anderson* is instructive here. There, the plaintiff had premised her retaliation claim on a formal complaint she had filed against her supervisor. *Anderson*, 122 F. App'x at 916. Plaintiff's formal complaint characterized the nature of her grievance as "Harassment/Discrimination." *Id.* But the grievance itself never alleged racial bias. *Id.* Nor did it try to demonstrate that racial bias "was the motivation for mistreatment" that plaintiff had experienced. *Id.* Had plaintiff included an allegation of mistreatment based on race—even an ultimately meritless allegation—such a grievance could have supported a retaliation claim. *Id.* But she didn't. And so, the Circuit held, plaintiff's "vague reference to discrimination and harassment" didn't cut it. Absent "any indication that this misconduct was motivated by race (or

33

another category protected by Title VII)[,]" a retaliation claim just didn't follow. *Id.*; *see also Steele v. Kroenke Sports Enters., L.L.C.*, 264 F. App'x 735, 746 (10th Cir. 2008) (agreeing with district court's analysis that plaintiff hadn't engaged in protected activity sufficient to support a Title VII or ADEA retaliation claim where she complained about not receiving a position but "did not mention sex or age discrimination and only complained that the action was 'unfair'").

This case presents an analogue. Ramos hinted at equal opportunity and illegality, much as *Anderson*'s plaintiff had done when she characterized her complaint as harassment or discrimination. *Id.* But, as in *Anderson*, Ramos's complaint to Brown never indicated that Love's failure to interview him stemmed from considerations of age, race, or national origin. Ramos's complaints about equal opportunity and unlawful behavior thus amount to vague references of the type *Anderson* found insufficient. Indeed, even Ramos concedes that he "never reported" that he felt "discriminated against because of [his] race, age or national origin[.]" Doc. 55-2 at 12–13 (Ramos Dep. 25:21–26:1). Instead, he complained that Bushnell hadn't "follow[ed] the proper steps because they basically did not interview" him. *Id.* at 13 (Ramos Dep. 26:2–3). And although he harbored suspicions that Love hadn't interviewed him because she only promoted African American employees, he didn't "recall mentioning that" in his conversation with Brown. *Id.* (Ramos Dep. 26:3–6).

Even if the court expands the purview of Ramos's retaliation claims—also considering Ramos's other interactions with HR reflected in the record—the same result follows. Ramos testified that, after his conversation with Brown, he reported to HR Specialist Elmore that he was "being ignored." *Id.* at 14, 15 (Ramos Dep. 30:18–23, 31:4–5). But the record doesn't demonstrate that he connected his being-ignored complaint to discrimination based on race, age, or national origin. And after Love denied Ramos's request to change shifts, Ramos again

34

complained to Elmore. *Id.* at 15–16 (Ramos Dep. 31:6–32:13). But Ramos again testified that he never mentioned discrimination based on race, age, or national origin during the shift-change conversation with Elmore. *Id.* at 17–18 (Ramos Dep. 34:20–35:13). Finally, Ramos doesn't recall ever reporting Love's comment about his age to a supervisor or human resources representative. *Id.* at 24 (Ramos Dep. 45:8–24). Thus, even when the court casts a wider net and fishes for protected activity in the record, it catches none.

In sum, the record reflects that Ramos never reported discrimination based on race, age, or national origin apart from his vague reference to Brown about "equal opportunity" and not "following the law[.]" Doc. 59-1 at 4–5 (Ramos Dep. Vol. II 13:14–14:3). Those summary judgment facts are fatal to his retaliation claims. No reasonable jury could infer that Ramos had engaged in protected activity on these facts. Ramos thus has failed to create a triable issue on the first element of his prima facie case for retaliation.

But even if he'd succeeded at the prima facie stage, Ramos's retaliation claims would fail nonetheless at the third *McDonnell Douglas* prong. That's so because Bushnell invokes the same legitimate, nondiscriminatory reasons it asserted in the discrimination claims context, and advances the same arguments against a finding of pretext. Doc. 55 at 27–28. Ramos never responds to those legitimate, nondiscriminatory reasons or the pretext arguments in the retaliation context. *See* Doc. 58 at 19–20. And the court already has concluded that Ramos's pretext arguments in the discrimination context are woefully insufficient to withstand summary judgment. *See* § V.B., above. So, even if Ramos successfully had established a prima facie case, his retaliation claims would fail at the pretext stage. The court thus grants summary judgment in favor of Bushnell on Ramos's Title VII, § 1981, and ADEA retaliation claims.

35

**VII.        Conclusion**

The court concludes that Ramos's Title VII and ADEA discrimination claims premised on the March 2021 promotion are time-barred.  And his § 1981 claim premised on national origin discrimination is not cognizable under the law.  So, the court grants summary judgment to Bushnell on these claims.  The court also concludes that Ramos fails to create a triable issue of pretext, dooming all but his ADEA discrimination claim—which remains unchallenged at summary judgment.  He likewise fails to create a triable issue of protected activity to support his retaliation claims.  The court thus grants summary judgment in Bushnell's favor on all claims challenged by its summary judgment motion.  Only Ramos's ADEA discrimination claim— premised just on the November 2022 and October 2023 promotions—survives for trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Bushnell Holdings, LLC's Partial Motion for Summary Judgment (Doc. 54) is granted.  One claim survives, as set forth in this Order.

**IT IS FURTHER ORDERED THAT** plaintiff Carlos Ramos's Motion for Leave to File Sur-Reply (Doc. 61) is denied.

**IT IS SO ORDERED.**

**Dated this 7th day of July, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
